FOLEY v. UTICA SANITARY MILK CO.

(Supreme Court, Appellate Division, Fourth Department. March 3, 1909.)

CONTRACTS (§ 290*)—TEST AND APPROVAL BY OWNER—WAIVER.

Where a contract for digging a well at a certain price per foot required plaintiff to test the well every four to six feet, and show defendant the amount of water, the depth to be decided by defendant after each test, not to exceed 500 feet, defendant, by directing plaintiff to proceed after 40 feet had been reached without finding water, and without requiring tests to be made, waived the clause requiring such tests.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1317; Dec. Dig. § 290.*]

Kruse, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by John H. Foley against the Utica Sanitary Milk Company. Judgment for plaintiff, and he appeals. Reversed, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

P. H. Fitzgerald, for appellant.
James H. Merwin, for respondent.

SPRING, J. The action is on a written agreement consisting of a proposal by the plaintiff dated April 7, 1908, and an acceptance by the defendant. By the terms of the proposal the plaintiff agreed to drill a six-inch well on the premises of the defendant, and it contained the following clauses:

"I will test this well every four to six feet and show you the amount of water. Price $2.50 per foot, depth to be decided after each test by you not to exceed 500 feet."

The plaintiff commenced work on the 13th of April, and on the 15th was down 40 feet and in the rock. The father of the plaintiff, who was then doing the work, reported to the manager of the defendant,

---

and was asked if he had discovered water, and he said "none to speak of" only "enough to wet the drill." The defendant expressed surprise, stating that he expected to get water before the rock was reached, whereupon, as the manager testified, the plaintiff responded:

" 'Well, if you insist on my pulling up the pipe to show you, I'll have to lay my men off, and go to the steam engine boiler works and get a rigging that will cost a lot of money.' I said I had no desire to put him to any expense, and, if there wasn't any more water there than he represented, to go on."

The president of the defendant participated in this conversation, and they directed the plaintiff to proceed with the drilling. The work progressed near the office of the company, and the manager saw the father of the plaintiff each day, but there was no talk as to the well, and no suggestion as to any further test until the well had reached the depth of 100 feet, when another conference was had and the president of the defendant investigated another well which had been drilled by the plaintiff to the depth of 250 feet in the immediate neighborhood for another company, and, after this investigation, ordered the plaintiff to proceed with the work, but not to go below 300 feet, which he did, reaching the depth stated without finding water, and the defendant then caused him to stop the drilling.

The manager testified, and it is not controverted, that, when the determination was made to continue the drilling after it was down 100 feet, the father of the plaintiff agreed, if no water was found in going down the stipulated distance, he would drill another well to the rock without charge, and he fulfilled this promise. The new well, close to the first one, was drilled to the rock about 20 feet, and water was discovered in the quicksand, but it could not be separated in the pipe from the sand, so the project of using the well was not feasible. Later the defendant caused a well six feet in diameter to be dug to the depth of about 19 feet, surrounding the pipes which were left after the plaintiff's tools and machinery had been removed. The quicksand was held back by planks running down to the bottom of the well and held in place by circular ribs, so that the well was cribbed, as the expression is. This well produced about 2,400 gallons of water daily.

The referee allowed the plaintiff to recover for 22 feet, the maximum distance to the rock, but rejected the major part of his claim. The contention of the defendant is, and it was sustained by the referee, that the plaintiff could not recover for the reason that he failed to comply with the provision in the agreement requiring him to test the well "every four to six feet, and show you [the defendant] the amount of water." In the light of the circumstances and the conduct of the parties as disclosed in the record, I think too rigid an enforcement of this clause has been applied. The plaintiff testified that, before making his proposal, he had the following conversation with Hatfield, the manager of the defendant:

"He (Hatfield) said in digging the foundation they got into quicksand and a big body of water. He wanted to know if I would put down a drilled well and get that water. I told him I could get water in clay, gravel, hardpan, or rock, but quicksand would fill up as fast as we could take it out. He said: 'Very well,' he would 'see what he could do,' and asked me the price, and I

told him $2.50 per foot, and that finished the conversation. . He said did I ever guarantee water, and I said that I guaranteed nothing but a hole in the ground. I said, 'It is at your option to stop when you want to.' That is all the conversation we had."

The father of the plaintiff gave his version of this conversation in this way:

"Mr. Hatfield said that they needed water at the plant where the milk comes up there, and had found water when they were digging the foundation in the sand and wanted to know if we could get water by drilling there, and my son went on and told him that they couldn't get water with a drilled well either in quicksand or hardpan; that they would either have to have coarse sand, gravel, or rock, and, if they thought of getting water without going down, they would have to dig it; that they couldn't do it with a pipe, because the sand would fill it up, or something to that effect."

There is no substantial contradiction over this testimony. The plaintiff and his father testified that they struck the quicksand before reaching the rock and found some water, as there always is in that sand. The plaintiff in describing his operations when the quicksand was reached said:

"I drawed out quicksand until I saw it was coming in continuous. Then I drove the pipe down to hardpan, and then I drove the hole down to the rock, cleaned the hole out—there was no water coming in, and I drove the pipe down into the rock. There was no water discovered by me or struck by me in drilling that well down to the rock, except such as appeared in the quicksand."

Both he and his father were men of large experience in drilling wells, and he testified as follows as to the effect of quicksand:

"When quicksand appears in drilling a well and the only water you discover is in the quicksand, it is not possible to obtain water from that drilled well."

Mr. Dewhurst, who dug the well for the defendant, also testified to the existence of this genuine quicksand commencing at the depth of six feet below the surface and extending down within a foot of the rock. The defendant's manager knew that no water could be obtained in the pipe from the quicksand, and, while a test would disclose the presence of water, it could not be utilized. There was no suggestion that he expected to dig a well. He knew he could get plenty of water in the quicksand by a dug well. Beyond that, after the depth of 40 feet was reached, he directed the plaintiff to continue the drilling, and again at 100 feet. There was no complaint because of the failure to test and report. Compliance with this provision was not insisted upon. I think the agents of the defendant waived strict enforcement of the test clause in the proposal. The time for them to speak was when the 40 feet had been drilled, and they had been furnished no test. Their direction that the drilling proceed in spite of that omission was an indication that they did not expect to receive reports unless water was discovered. After all, the proof discloses that no water was discovered in sufficient quantity or separable from the quicksand, so that its use was practicable. The defendant wished water by a drilled well, and, as it put the maximum limit of its depth 500 feet, it must have been expected that the drilling might continue down a considerable distance. The defendant could stop the work at any time and the test

was for the purpose of apprising its manager whether water was found feasible for use. We must construe the agreement in the light of the object sought to be obtained. I think, therefore, that the judgment should be reversed.

Judgment reversed, and a new trial ordered on the law and facts before another referee, with costs to appellant to abide event. All concur, except KRUSE, J., who dissents in a memorandum.

KRUSE, J. (dissenting memorandum for affirmance). It is reasonably certain that either the plaintiff's father, who was in charge of the drilling of the well, did not make a proper test for water in drilling the 20 feet to the rock, or else that he purposely misrepresented to the defendant the actual facts regarding the tests, for, when the second well was drilled, a couple of feet from the first, an abundant supply of water was found before reaching the rock. It is true that it was roily, and that there was quicksand, and very likely it was thought, in view of the shallowness of the well, it would be more practicable to dig a well and stone it up, as was done. But, if the plaintiff had made the tests and furnished the information in the first instance, as the contract required him to do, the defendant could have then determined whether to proceed with the drilling or to do precisely what was done after it obtained the information regarding the supply of water, when the second well was drilled. The statement of the person in charge of the drilling of the well that there was no water there, or just enough to wet the drill, when it appears that in the very place water flowed into the well subsequently made at the rate of 30 gallons per hour, seems quite incredible. At all events, I am not willing to say that the referee was not justified in finding against the plaintiff upon that question.

Of course, it is unfortunate that the plaintiff should lose his pay for the extra drilling, but it is unjust that the defendant should pay for something which is worthless, and which would probably not have been done had the plaintiff made the tests and given accurate information regarding the presence of water.

I think the referee's findings are sustained by the evidence, and that the judgment should be affirmed.