■ VESTRON, INC., Respondent, v ITC PRODUCTIONS, INC., Appellant, et al., Defendant. [597 NYS2d 382] —Order, Supreme Court, New York County (Burton S. Sherman, J.), entered August 18, 1992, which, inter alia, granted plaintiff's motion for summary judgment as to liability on the first and second causes of action alleging breach of contract, unanimously reversed, to the extent appealed from, and as limited by appellant's brief, on the law, with costs, and plaintiff's motion for summary judgment is denied.

In April of 1985, plaintiff Vestron, Inc., defendant-appellant ITC Productions, Inc. (ITC) and Computer Graphics Laboratories, Inc. (CGL) executed an agreement to create an animated film, featuring music written by John Lennon and Paul McCartney of the Beatles, which was tentatively titled "Strawberry Fields." As here pertinent, ITC was to invest $1.25 million and to obtain and supply the "Beatles masters" (Beatles music performed by the Beatles); CGL was to supply the "storyboard," the animation and production; and Vestron was

to invest $1.25 million, to be paid in installments to CGL, in exchange for home video distribution and pay TV rights.

By mid-1987 it became apparent that ITC would be unable to obtain the Beatles masters. Vestron ceased its scheduled cash flow payments to CGL, and the three parties thereupon discussed proceeding without the masters, and employing instead "cover versions" (Beatles songs performed by other artists). By letter dated July 16, 1987, ITC advised Vestron that if Vestron wished to drop out of the project, ITC was prepared to immediately reimburse Vestron's investment as of that date ($738,235), and to assume Vestron's financial obligations, rights and entitlements under the April 1985 "Strawberry Fields" agreement. The letter continued: "On the other hand, if Vestron chooses to proceed with or without the masters we, of course, welcome that also. What is not workable from our perspective is for Vestron not to meet its financial obligations and attempt to preserve an 'in-or-out' option sometime down the road."

By August 21, 1987, after discussions among the three parties, it was agreed that ITC would provide cover versions of 10 specified Beatles songs at a "workable" rate of "approximately one master per month." In a September 23, 1987 letter from Wm. Christopher Gorog (ITC's President and CEO) to Vestron, ITC repeated its buy out offer:

"[A]s discussed on numerous occasions before, we feel that Vestron should be able to make a decision as to whether or not it wants to stay in the picture on the basis of first class cover versions being recorded for the film, in lieu of the original Beatles music. If Vestron chooses not to be involved, as stated before, we would be willing to fully refund all payments made by Vestron to CGL and take over Vestron's responsibilities.

"On the other hand, I understand Vestron's concern about the relative quality of the prospective new cover versions that are going to be produced. Therefore, as discussed between myself and Michael Wiese [of Vestron], I do not object for the parties to continue in good faith to fund the project together in order to give Vestron an opportunity to see how the soundtrack is coming together which will enable Vestron to make a judgment as to whether or not Vestron wants to stay involved * * *

"I am also not interested in the situation 'continuing indefinitely' however, in deference to Vestron's apparent concern about the soundtrack. I am willing to defer a definitive resolu-

tion to this matter until Vestron has more information to analyze [its] position."

Mr. Gorog asserted in his affidavit in opposition to Vestron's summary judgment motion that Vestron had indicated its approval for using the cover versions. He averred that Michael Wiese, a Vestron executive, had worked with ITC in selecting the recording artists to perform the cover versions, approved each of the recording artists before they began work, and approved each song as it was completed. In reliance on Wiese's expressed enthusiasm for the first cover version, and in conjunction with Wiese, ITC proceeded to negotiate deals with a list of prominent and commercially successful recording artists—including Michael Jackson, Robert Palmer, Cyndi Lauper, Crosby Stills and Nash and Luther Vandross—to perform additional cover versions, and expended considerable company resources to do so. Throughout this period, Mr. Wiese allegedly was in daily contact with ITC, was enthusiastic about the high caliber of the recording artists and the high quality of the recordings, and continually indicated his approval of the revised project. Accordingly, a jury could infer from the conduct of the parties that Vestron had agreed to use the cover versions instead of the original Beatles masters.

Sometime thereafter, as alleged by ITC, it became increasingly apparent that CGL was incapable of creating an animated film of minimally acceptable production quality. Indeed, Vestron alleged in a cause of action for breach of contract against CGL that the work delivered by CGL had been "of a quantity substantially below industry and acceptable standards," and a "dispute had arisen between ITC and CGL concerning the quality of CGL's production work." Also, as Vestron noted in its complaint, CGL was "obligated to deliver a 'producer's cut' of the film no later than eighteen months after the approval of the final storyboard, character design and final budget," but failed to do so.

By letter dated June 8, 1988, Vestron purported to accept ITC's September 23, 1987 buyout offer on the ground, *inter alia,* that the cover versions of the Beatles songs did "not represent an adequate substitute for the Beatles masters that were originally projected to be part of this program." ITC responded that its offer to buy out Vestron was stale and void since Vestron had effectively "rejected" that offer by not timely acting upon it. ITC asserted in a June 14, 1988 response to Vestron, and has continued to assert ever since, that the real reason for Vestron's belated attempt to get out of the project was Vestron's dissatisfaction with CGL's performance,

and cites in support of that theory Vestron's claims against CGL in Vestron's complaint as noted above.

Vestron's first two causes of action against ITC allege breach of the September 23, 1987 buyout offer, which allegedly ripened into an agreement when it was accepted on June 8, 1988, and breach of the Strawberry Fields agreement respectively. As pertinent to this appeal, the IAS Court granted Vestron's motion for summary judgment as to those two causes of action on grounds that ITC had not provided either the Beatles masters under the Strawberry Fields agreement, or the cover versions under the September 23, 1987 buyout "agreement". However, Mr. Gorog's affidavit in opposition to the motion stated that ITC had submitted, and Vestron had approved, eight cover versions of Beatles songs by June 8, 1988 when Vestron purported to accept the buyout offer. It surely cannot be concluded as a matter of law that the almost casual mention of "approximately one master per month" as "workable" restricted ITC to a strict timetable which, if deviated from even slightly, would warrant the grant of a $1.25 million summary judgment in favor of Vestron. Moreover, it is far from clear that this proposed schedule was not adhered to even in a strict sense, because the "approximately one master per month" commitment, further loosened as it was by the phrase "would be workable," did not mature until June 21, 1988 at the earliest, and Vestron's purported acceptance of the buyout offer was dated June 8, 1988.

There are also factual questions as to whether Vestron by its conduct justified ITC's conclusion that the buyout offer had been rejected (21 NY Jur 2d, Contracts, § 42), and whether a fair reading of the buyout offer permits a construction that the offer would remain open for over eight months, particularly in light of Mr. Gorog's statements in the September 23, 1987 letter restating the buyout offer that he was not interested in the uncertain situation " 'continuing indefinitely' " and that a final decision would be deferred "until Vestron has more information to analyze [its] position." "If an offer specifies the time of its duration, it must be accepted within that time; however, where no time is specified for the offer's duration, it must be accepted within a reasonable time. What is a reasonable time is a question of fact, dependent on the nature of the contract." (21 NY Jur 2d, Contracts, § 52; *see, State of New York v Atlantic Audio-Visual Corp.,* 118 AD2d 998, 1001.)

There is also a factual issue as to whether Vestron by its conduct waived, or was estopped from insisting upon, compli-

ance with the requirement set forth in the Strawberry Fields agreement that ITC supply Beatles masters for the project (22 NY Jur 2d, Contracts, § 330; *Foley v Utica Sanitary Milk Co.,* 131 App Div 456, 459-460; *Camilli & Sons v State of New York,* 41 Misc 2d 218, 223). Accordingly, summary judgment should have been denied on Vestron's second cause of action also. Concur—Sullivan, J. P., Carro, Kupferman and Rubin, JJ.